**UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MINNESOTA**

|  |  |
|---|---|
|  | Jointly Administered Under<br>Case No. 19-33629 (WJF) |
| In re:<br><br>Minnesota School of Business, Inc.,<br>Globe University, Inc.,<br><br>    Debtors. | Case No.: 19-33629<br>Case No.: 19-33632<br>Chapter 11 Cases |

**DISCLOSURE STATEMENT IN SUPPORT OF DEBTORS' JOINT PLAN OF
REORGANIZATION DATED MARCH 18, 2020**

MINNESOTA SCHOOL OF BUSINESS, INC. ("MSB") AND GLOBE UNIVERSITY, INC. ("GLOBE," AND, TOGETHER WITH MSB, THE "DEBTORS") SEEK CONFIRMATION OF THEIR JOINT CHAPTER 11 PLAN OF REORGANIZATION (THE "PLAN").

THIS DISCLOSURE STATEMENT ("DISCLOSURE STATEMENT"), THE PLAN, THE ACCOMPANYING BALLOTS, AND THE RELATED MATERIALS ARE BEING FURNISHED BY THE DEBTORS, PURSUANT TO SECTIONS 1125 AND 1126 OF THE BANKRUPTCY CODE IN CONNECTION WITH THE SOLICITATION BY THE DEBTORS OF VOTES TO ACCEPT THE PLAN AS DESCRIBED IN THIS DISCLOSURE STATEMENT.

THE CONFIRMATION AND EFFECTIVENESS OF THE PLAN ARE SUBJECT TO MATERIAL CONDITIONS PRECEDENT, SOME OF WHICH MAY NOT BE SATISFIED. SEE ARTICLE X OF THE PLAN. THERE IS NO ASSURANCE THAT THESE CONDITIONS WILL BE SATISFIED OR WAIVED.

HOLDERS OF CLAIMS AGAINST THE DEBTORS ARE ENCOURAGED TO READ AND CAREFULLY CONSIDER THE MATTERS DESCRIBED IN THIS DISCLOSURE STATEMENT INCLUDING UNDER "RISK FACTORS TO BE CONSIDERED" IN ARTICLE X OF THIS DISCLOSURE STATEMENT.

IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTORS (INCLUDING, WITHOUT LIMITATION, THOSE HOLDERS OF CLAIMS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE

PLAN OR WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN AND THE TRANSACTIONS DESCRIBED IN THE PLAN.

NEITHER THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE SECURITIES COMMISSION HAS APPROVED OR DISAPPROVED OF ANY SECURITIES THAT MAY BE DEEMED TO HAVE BEEN ISSUED PURSUANT TO THE PLAN OR THIS DISCLOSURE STATEMENT OR HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL SECURITIES AND IS NOT A SOLICITATION OF AN OFFER TO BUY SECURITIES IN ANY STATE WHERE THE ORDER OR SALE IS NOT PERMITTED.

TO THE EXTENT ANY TREATMENT UNDER THE PLAN IS DEEMED TO CONSTITUTE THE ISSUANCE OF A SECURITY, NONE OF THE SECURITIES WILL HAVE BEEN REGISTERED WITH THE SECURITIES AND EXCHANGE COMMISSION UNDER THE SECURITIES ACT, OR UNDER ANY STATE SECURITIES OR "BLUE SKY" LAWS, AND THE SECURITIES WILL BE ISSUED IN RELIANCE UPON EXEMPTIONS FROM THE SECURITIES ACT AND EQUIVALENT STATE LAWS OR SECTION 1145 OF THE BANKRUPTCY CODE.

THERE HAS BEEN NO INDEPENDENT AUDIT OF THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT OR IN ANY EXHIBIT EXCEPT AS EXPRESSLY INDICATED IN THIS DISCLOSURE STATEMENT OR IN ANY EXHIBIT. THIS DISCLOSURE STATEMENT WAS COMPILED FROM INFORMATION OBTAINED BY THE DEBTORS FROM NUMEROUS SOURCES BELIEVED TO BE ACCURATE TO THE BEST OF THEIR KNOWLEDGE, INFORMATION, AND BELIEF. THE DEBTORS' PROFESSIONALS HAVE NOT INDEPENDENTLY VERIFIED ANY OF THE INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT AND ARE NOT RESPONSIBLE FOR ANY INACCURACIES THAT MAY BE CONTAINED IN THIS DISCLOSURE STATEMENT OR THE PLAN.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF, AND THE DELIVERY OF THIS DISCLOSURE STATEMENT WILL NOT, UNDER ANY CIRCUMSTANCES, CREATE ANY IMPLICATION THAT THE INFORMATION IS CORRECT AT ANY TIME SUBSEQUENT TO THIS DATE, AND THE DEBTORS UNDERTAKE NO DUTY TO UPDATE THE INFORMATION.

THIS DISCLOSURE STATEMENT AND THE RELATED DOCUMENTS ARE THE ONLY DOCUMENTS AUTHORIZED BY THE BANKRUPTCY COURT TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES ACCEPTING OR REJECTING THE PLAN. NO REPRESENTATIONS ARE AUTHORIZED BY THE BANKRUPTCY COURT CONCERNING THE DEBTORS, THE DEBTORS' BUSINESS OPERATIONS, THE VALUE OF THE DEBTORS' ASSETS, OR THE VALUES OF ANY INTERESTS

DESCRIBED TO BE ISSUED OR BENEFITS OFFERED PURSUANT TO THE PLAN, EXCEPT AS EXPLICITLY SET FORTH IN THIS DISCLOSURE STATEMENT OR ANY OTHER DISCLOSURE STATEMENT OR OTHER DOCUMENT APPROVED FOR DISTRIBUTION BY THE BANKRUPTCY COURT. HOLDERS OF CLAIMS AND INTERESTS SHOULD NOT RELY UPON ANY REPRESENTATIONS OR INDUCEMENTS MADE TO SECURE ACCEPTANCE OF THE PLAN OTHER THAN THOSE SET FORTH IN THIS DISCLOSURE STATEMENT.

FOR THE CONVENIENCE OF HOLDERS OF CLAIMS AND INTERESTS, THIS DISCLOSURE STATEMENT SUMMARIZES THE TERMS OF THE PLAN AND CERTAIN OF THE PLAN DOCUMENTS. IF THERE IS ANY INCONSISTENCY BETWEEN THE PLAN OR THE APPLICABLE PLAN DOCUMENTS AND THIS DISCLOSURE STATEMENT, THE TERMS OF THE PLAN OR THE APPLICABLE PLAN DOCUMENTS ARE CONTROLLING. THE SUMMARIES OF THE PLAN AND THE PLAN DOCUMENTS IN THIS DISCLOSURE STATEMENT DO NOT PURPORT TO BE COMPLETE AND ARE SUBJECT TO, AND ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO, THE FULL TEXT OF THE PLAN AND THE APPLICABLE PLAN DOCUMENTS, INCLUDING THE DEFINITIONS OF TERMS CONTAINED IN THE PLAN AND OTHER PLAN DOCUMENTS. ALL HOLDERS OF CLAIMS AND HOLDERS OF INTERESTS ARE ENCOURAGED TO REVIEW THE FULL TEXT OF THE PLAN AND THE PLAN DOCUMENTS, AND TO READ CAREFULLY THIS ENTIRE DISCLOSURE STATEMENT, INCLUDING ALL EXHIBITS.

THIS DISCLOSURE STATEMENT MAY NOT BE RELIED ON FOR ANY PURPOSES OTHER THAN TO DETERMINE WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN, AND NOTHING STATED IN THIS DISCLOSURE STATEMENT SHALL CONSTITUTE AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PERSON, OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER PERSON, OR BE DEEMED CONCLUSIVE EVIDENCE OF THE TAX OR OTHER LEGAL EFFECTS OF THE PLAN ON THE DEBTORS OR HOLDERS OF CLAIMS OR INTERESTS.

THIS DISCLOSURE STATEMENT CONTAINS STATEMENTS THAT ARE FORWARD-LOOKING. FORWARD-LOOKING STATEMENTS ARE STATEMENTS OF EXPECTATIONS, BELIEFS, PLANS, OBJECTIVES, ASSUMPTIONS, PROJECTIONS, AND FUTURE EVENTS OF PERFORMANCE. AMONG OTHER THINGS, THIS DISCLOSURE STATEMENT CONTAINS FORWARD-LOOKING STATEMENTS WITH RESPECT TO FUTURE DETERMINATION OF CLAIMS AND DISTRIBUTIONS ON CLAIMS. THESE STATEMENTS, ESTIMATES, AND PROJECTIONS MAY OR MAY NOT PROVE TO BE CORRECT. ACTUAL RESULTS COULD DIFFER MATERIALLY FROM THOSE REFLECTED IN THESE FORWARD-LOOKING STATEMENTS. FORWARD-LOOKING STATEMENTS ARE SUBJECT TO INHERENT UNCERTAINTIES AND TO A WIDE VARIETY OF SIGNIFICANT BUSINESS, LEGAL, AND ECONOMIC RISKS, INCLUDING, AMONG OTHERS, THOSE DESCRIBED IN THIS DISCLOSURE STATEMENT. THE DEBTORS UNDERTAKE NO OBLIGATION TO UPDATE ANY FORWARD-LOOKING STATEMENT. NEW FACTORS EMERGE FROM TIME TO TIME

AND IT IS NOT POSSIBLE TO PREDICT ALL FACTORS, NOR CAN THE IMPACT OF ALL FACTORS BE ASSESSED.

HOLDERS OF CLAIMS AND INTERESTS SHOULD NOT CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE. EACH HOLDER SHOULD CONSULT WITH ITS OWN LEGAL, BUSINESS, FINANCIAL, AND TAX ADVISORS WITH RESPECT TO ANY MATTERS CONCERNING THIS DISCLOSURE STATEMENT, THE SOLICITATION OF VOTES TO ACCEPT THE PLAN, THE PLAN, AND THE TRANSACTIONS DESCRIBED.

EACH HOLDER OF A CLAIM ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN SHOULD READ THIS DISCLOSURE STATEMENT AND THE PLAN (INCLUDING ALL EXHIBITS AND SCHEDULES TO THE PLAN AND DISCLOSURE STATEMENT) IN THEIR ENTIRETY BEFORE VOTING.

# TABLE OF CONTENTS

I.      INTRODUCTION. ................................................................................................ 1
        A.      Summary of the Plan................................................................................. 1
        B.      Voting Procedures.................................................................................... 1
                1.      Ballots. ........................................................................................ 1
                2.      Importance of Your Vote. ............................................................ 2
        C.      Brief Explanation of Chapter 11. ............................................................ 2

II.     DESCRIPTION OF THE DEBTORS. .................................................................. 3
        A.      Nature and History of the Debtors. .......................................................... 3
        B.      The State of Minnesota's Litigation. ....................................................... 4
        C.      Cessation of Operations as Educational Institutions................................ 4
        D.      Summary of Claims Against the Debtors. ................................................ 5
                1.      State of Minnesota ....................................................................... 5
                2.      U.S. Department of Education ...................................................... 6
                3.      Trade Claims ............................................................................... 7
                4.      Former Student Proofs of Claim .................................................. 7
                5.      Summary of General Unsecured Claims....................................... 7
                6.      Co-Borrower Liabilities .............................................................. 7
                7.      Insider Claims ............................................................................. 7
                8.      Intercompany Claims ................................................................... 8
        E.      Summary of Debtors' Assets ................................................................... 8
        F.      Potential Causes of Action ...................................................................... 9

III.    EVENTS DURING THE CHAPTER 11 CASE. .................................................. 9
        A.      Bankruptcy Filing and First Day Orders.................................................. 9
        C.      Schedules and Statements. ...................................................................... 9
        D.      Retention and Employment of the Debtors' Professionals. .................... 10
        E.      Appointment of Official Committee of Unsecured Creditors.................. 10
        F.      Motions to Convert or Dismiss, or to Appoint a Trustee or Examiner.... 10
        G.      U.S. Department of Education Administrative Process........................... 10
        H.      Continuation of State Court Litigation .................................................. 10
        I.      Claim Objections. ................................................................................. 11
        J.      Claim Estimation Process. ..................................................................... 11

IV.     SUMMARY OF THE PLAN............................................................................. 11
        A.      Overview of Classification and Treatment of Claims and Equity Interests.......... 11
        B.      Description of Classes and Treatment. ................................................... 12
        C.      Reorganization Option........................................................................... 19
                1.      Substantive Consolidation ......................................................... 19
                2.      Revesting and Ongoing Operations ............................................ 19
                3.      Exit Financing............................................................................ 20
                4.      Preservation of Causes of Action and Avoidance Claims ........... 20
        D.      Liquidation Option................................................................................ 20
                1.      Liquidating Fund........................................................................ 20
                2.      Liquidating Agent ...................................................................... 21

       3.      Preservation of Causes of Action and Avoidance Claims ........................ 21
  E.     Distributions and Claims Administration. .............................................. 21
  F.     Executory Contracts and Unexpired Leases. ........................................... 21
  G.    Conditions to Confirmation and the Effective Date. ............................... 22
  H.    Effects of Confirmation. ......................................................................... 22
       1.      Title to and Vesting of Assets. ................................................. 22
       2.      Corporate Action. .................................................................... 23
       3.      Injunction. ............................................................................... 23
       4.      Discharge. ................................................................................ 23
       5.      Permanent Injunction. ............................................................. 23
       6.      Third Party Injunction ............................................................. 24
       7.      Exculpation and Limitation of Liability. .................................. 24

V.     POST CONFIRMATION MANAGEMENT OF THE REORGANIZED
       DEBTOR ........................................................................................................... 24

VI.    MEANS OF EXECUTION ............................................................................... 25

VII.   TAX CONSEQUENCES OF THE PLAN. ........................................................ 25
  A.    Federal Income Tax Consequences to Holders of Unsecured Claims. ................ 26
  B.    Federal Income Tax Consequences to the Debtors. ............................... 26
  C.    Tax Consequences to the Liquidating Fund. .......................................... 27

VIII.  ALTERNATIVES TO THE PLAN. ................................................................... 27
  A.    Alternative Plan Pursuant To Chapter 11 of the Bankruptcy Code. ................... 27
  B.    Dismissal of the Chapter 11 Cases. ....................................................... 28
  C.    Conversion to Chapter 7 Liquidation. .................................................... 28

IX.    ACCEPTANCE AND CONFIRMATION OF THE PLAN. ............................... 28
  A.    General Confirmation Requirements. ..................................................... 28
  B.    Best Interests Test. .................................................................................. 29
  C.    Financial Feasibility Test. ....................................................................... 30
  D.    Cramdown Alternative. ........................................................................... 30

X.     RISK FACTORS TO BE CONSIDERED ......................................................... 30
  A.    Failure to Satisfy Vote Requirement ...................................................... 31
  B.    Non-Confirmation or Delay of Confirmation of the Plan. ..................... 31
  C.    Non-Consensual Confirmation. .............................................................. 31
  D.    Risk of Non-Occurrence of the Effective Date. ..................................... 31
  E.    Classification and Treatment of Claims. ................................................ 31

XI.    CONCLUSION ................................................................................................. 32

**EXHIBITS**
EXHIBIT A – LIQUIDATION ANALYSIS
EXHIBIT B – CASH FLOW PROJECTIONS

## I.       INTRODUCTION.

On November 20, 2019 (the "Filing Date"), the Debtors filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"). The cases are being jointly administered and are pending before the United States Bankruptcy Court for the District of Minnesota (the "Bankruptcy Court").

The Plan sets forth, among other things, the proposed treatment of Claims and Equity Interests in accordance with the Bankruptcy Code. This Disclosure Statement is intended to explain the Plan and provide adequate information to allow an informed judgment regarding the Plan. A copy of the Plan is included with this Disclosure Statement. If the Plan and this Disclosure Statement are not consistent, the terms of the Plan control. Capitalized terms used, but not defined, in this Disclosure Statement shall have the same meanings ascribed to them in the Plan.

### A.       Summary of the Plan.

In broad strokes, the Plan contemplates two possible alternative plan structures (the "Plan Toggle"): (1) reorganization of the Debtors and payment in full of Allowed General Unsecured Claims from cash on hand and the proceeds of exit financing from two sources: (i) loans from a commercial lender, which will be secured by mortgages on property of MSB's subsidiaries and guaranteed by the Debtors' principal shareholder; and (ii) loans from the Debtors' principal shareholder, which will be secured by junior mortgages on property of MSB's subsidiaries (the "Reorganization Option"); or (2) if the Allowed General Unsecured Claims exceed $20,000,000 as of the Confirmation Date, the transfer of all property of the estate to a settlement fund (the "Liquidation Option"). The applicable Plan Toggle option will be determined in connection with plan confirmation and will be specified in the Confirmation Order.

### B.       Voting Procedures.

#### 1.       Ballots.

If you are entitled to vote to accept or reject the Plan, a ballot is enclosed for purposes of voting on the Plan. If you hold claims in more than one Class and you are entitled to vote Claims in more than one Class, you will receive separate ballots that must be used to vote in each separate Class. If voting for or against the Plan, please use only the ballot or ballots sent to you with this Disclosure Statement. Votes cast to accept or reject the Plan will be counted by Class.

Please read the voting instructions on the ballot for a thorough explanation of the voting procedures.

**IF YOU BELIEVE THAT YOU ARE A HOLDER OF A CLAIM OR EQUITY INTEREST IN A VOTING CLASS FOR WHICH YOU DID NOT RECEIVE A BALLOT, IF YOUR BALLOT IS DAMAGED OR LOST, OR IF YOU HAVE QUESTIONS CONCERNING VOTING PROCEDURES, PLEASE CONTACT THE DEBTORS' COUNSEL AT GLOBE-MSB@FREDLAW.COM. THE DEBTORS AND THEIR COUNSEL CANNOT PROVIDE YOU WITH ANY LEGAL ADVICE. FACSIMILE, E-**

**MAIL, OR ELECTRONICALLY TRANSMITTED BALLOTS WILL NOT BE ACCEPTED.**

A ballot that does not indicate an acceptance or rejection of the Plan or otherwise not properly completed will not be counted either as a vote to accept or a vote to reject the Plan. If you cast more than one ballot voting the same Claim or Equity Interest before the voting deadline, the last ballot received before the voting deadline will supersede all prior ballots. In addition, you may not split your votes for your Claims within a particular Class under the Plan. Therefore, a ballot within a given Class received from a single creditor that partially rejects and partially accepts the Plan will not be counted. You may not change your vote after the voting deadline passes.

To be counted, completed ballots must be mailed to the clerk of the Bankruptcy Court at the following address:

> Office of the Clerk of Court
> Attention: _____
> U.S. Bankruptcy Court District of Minnesota
>
> _____
> _____

2.   *Importance of Your Vote.*

Your vote is important. The Bankruptcy Code defines acceptance by a Class of Claims as acceptance by holders of at least two-thirds in amount and a majority in number of Allowed Claims in the Class that Vote.

Only the ballots of those Creditors who actually vote are counted for purposes of determining whether a class voted to accept the Plan. Your failure to vote will leave to others the decision to accept or reject the Plan.

**C.   Brief Explanation of Chapter 11.**

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Upon the filing of a petition for reorganization under Chapter 11, Section 362 of the Bankruptcy Code generally provides for an automatic stay of all attempts to collect claims or enforce liens that arose prior to the commencement of the bankruptcy case or that otherwise interfere with a debtor's property or business.

The principal objective of a Chapter 11 reorganization is the confirmation of a plan of reorganization or liquidation. The plan sets forth the means for satisfying the claims of creditors and interests of shareholders or members of the debtor. The plan and a disclosure statement that contains information necessary to allow creditors, shareholders, and members to evaluate the plan are sent to creditors, shareholders, and members whose claims or interests are impaired, who then vote to accept or reject the plan.

A class of claims is entitled to vote to accept or reject a plan if that class is "impaired" by the plan. A class of claims is impaired unless the plan cures any defaults that may exist with respect to the claims and leaves unaltered the legal, equitable, and contractual rights to which the claim entitles the holder of the claim.

A plan may be confirmed under Section 1129(a) of the Bankruptcy Code if each class of claims or interests is not impaired by the plan or if each class has voted to accept the plan. Votes will be counted only with respect to claims:  (1) that are listed on the Debtors' Schedules other than as disputed, contingent, or unliquidated; or (2) for which a proof of claim was filed on or before the claim filing deadline set by the Bankruptcy Court for the filing of proofs of claim. However, any vote by a holder of a claim will not be counted if the claim has been disallowed or is the subject of an unresolved objection, absent an order from the Bankruptcy Court allowing the claim for voting purposes. A class of claims has accepted a plan if creditors that hold at least two-thirds in amount and more than one-half in number of the allowed voting claims in the class have voted to accept the plan.

If an impaired class votes to reject the plan, the proponent of the plan may seek to "cram down" the plan by confirming it under Section 1129(b) of the Bankruptcy Code. A plan proponent may cram down a plan upon a rejecting class only if another impaired class has voted to accept the plan, the plan does not discriminate unfairly, and the plan is fair and equitable with respect to each impaired class that has not voted to accept the plan.

Voting on the plan by each holder of a claim in an impaired class is important. After carefully reviewing the Plan and Disclosure Statement, each holder of a claim should vote on the enclosed ballot either to accept or reject the Plan. Any ballot that does not appropriately indicate acceptance or rejection of the Plan will not be counted. A ballot that is not received by the deadline will not be counted. If a ballot is lost, damaged, or missing, a replacement ballot may be obtained by sending a written request to the Debtors' counsel.

Section 1129(a) of the Bankruptcy Code establishes the conditions for the confirmation of a plan. These conditions are too numerous to be fully explained here. Parties are encouraged to seek independent legal counsel to answer any questions concerning the Chapter 11 process. Among the conditions for plan confirmation is that either each holder of a claim or interest must accept the plan, or the plan must provide at least as much value as would be received upon liquidation under Chapter 7 of the Bankruptcy Code.

If the Plan is confirmed by the Bankruptcy Court, its terms are binding on the Debtors, all Creditors, all Equity Interest holders and other parties in interest, regardless of whether they have voted to accept the Plan.

## II.    DESCRIPTION OF THE DEBTORS.

### A.    Nature and History of the Debtors.

MSB and Globe were founded in 1877 and 1885, respectively.  Each school was founded by traditional scholars who recognized the need for career-focused practical training and opened schools with programs that were applicable to the marketplace as it existed then: business, secretarial, English, penmanship, shorthand, and bookkeeping.  From their inception through

3

their closing in September of 2017, the schools focused on teaching career skills relevant to the real-world centering on applied, experiential learning that offer the convenience of having a school in the students' local communities as well as employer-designed and desired programs.

In 1972, Terry Myhre and his father, Helmer, purchased Globe College of Business.  In 1988, Terry Myhre purchased Minnesota School of Business and from that time forward, the Debtors functioned as sister schools with common curriculum, catalog and oversight.  The Debtors are each currently owned by Terry Myhre and his adult children.

In the early 1990's, the schools added associate degree programs; in the late 1990's, the schools added bachelor degree programs; and in 2004, the schools added graduate degree programs and Globe College became Globe University. The schools offered diploma and certificate level programs, as well as bachelors and masters degrees, across a wide variety of disciplines, including business, accounting, technology, media/graphics, allied health, paralegal, veterinary technology and nursing, including a doctorate in business administration.

Concurrently with the expansion in programs, MSB expanded its geographical reach by opening its first branch campus in Brooklyn Center in 1989, expanding to Plymouth, Minnesota in 2002, and then adding seven additional campuses from 2004 through 2009.  In the time period of 2004 through 2009, Globe University also expanded is geographical reach by opening seven campuses in Wisconsin, one in South Dakota and one additional campus in Minnesota (Minneapolis).

Although the Debtors are no longer operating as educational institutions, as explained below, the Debtors have significant operations through certain wholly owned subsidiaries, which own and operate commercial real estate.

## B.      The State of Minnesota's Litigation.

In July 2013, the Debtors received a Civil Investigative Demand from the Minnesota Attorney General.  This was followed by a lawsuit in 2014, which alleged that the Debtors engaged in widespread deceptive practices.  In 2015, the lawsuit was amended to include a claim that the interest rate of certain of the loans that were provided by the Debtors to certain students exceeded the interest rate allowed under state usury laws, and that the Debtors were not authorized to issue the loans because they were not a licensed lender.  As a result of the lawsuit, the Debtors were determined to have violated Minnesota's consumer protection statute with respect to its Criminal Justice program and violated Minnesota's lending laws with respect to a subset of its institutional loans. The lawsuit is essentially complete but for the determination of certain claims, as discussed in more detail below.

## C.      Cessation of Operations as Educational Institutions.

The Debtors ceased operating as educational institutions in September 2017.

### D.    Summary of Claims Against the Debtors.

The Debtors filed their Schedules and Statements of Financial Affairs on December 16, 2019 [Docket No. 44; Globe Docket No. 24], which, among other things, identify the known claims against the Debtors.  Since that time, and as of the date of this Disclosure Statement, approximately 96 proofs of claim have been filed in the MSB case and approximately 9 proofs of claim have been filed in the Globe case.  The following is a summary of the claims.

#### 1.    State of Minnesota

The State of Minnesota asserts several distinct claims arising from the State court litigation.  [Globe, Claim No. 9; MSB, Claim No. 95.]    Several of these claims have been reduced to judgment or are otherwise not disputed.  The following chart sets forth the claims that are not undisputed:

| Claim | Amount |
|---|---|
| Counts I & II: Civil Penalty Award | $100,000.00 |
| Counts I & II: Costs and Fees (deposited with State Court) | $332,582.09 |
| Counts III & IV: Refund of Principal Paid, Plus Pre-Judgment Interest | $4,721,720.00 |

Several of the remaining claims are unliquidated and subject to dispute. For the sake of clarity, the State takes the position that these claims are claims *of the State* as opposed to claims of the individual former students, despite the fact that the Order for Restitution gives a right to payment to those individual former students who are entitled to restitution.  The Debtors are preserving that issue, not waiving any right to contest the State's position and, solely for the sake of this presentation, describing the applicable claim as a claim of the State. The following chart sets forth the claims asserted by the State that have not been liquidated, along with the estimates of those claims that were presented by the State in its Proof of Claim and the Debtor's estimate based on its review of the available information, which is ongoing.   **THESE CLAIM AMOUNTS ARE ESTIMATES ONLY AND HAVE NOT BEEN FINALLY ALLOWED BY THE COURT OR DETERMINED BY THE STATE COURT.**

| Claim | State's Estimate | Debtor's Estimate |
|---|---|---|
| Counts I & II: Total Restitution Award | $39,603,040 | $9,325,611 |
| Counts III & IV: Civil Penalties | $5,000,000 | $500,000 |
| Counts III & IV: Costs and Fees | $1,909,638 | $1,000,000 |

The claims included in the "Counts I & II: Total Restitution Award" arise from the Hennepin County District Court's Order for Restitution, which set forth a process by which certain former students in the Debtors' criminal justice program may submit a claim to the Attorney General.  The Debtors are then given an opportunity to review and object to those claims.

As of the date of this Disclosure Statement, the Attorney General asserts that approximately 644 former students have filed restitution claims with the Attorney General. From an initial review of those claim forms, the Debtors believe that a claim should be reduced or disallowed on the following grounds or other grounds the Debtors may raise:

1. To the extent it includes institutional scholarship and grants (essentially discounts to tuition provided by the schools);
2. To the extent it includes institutional loans with a greater than 8% interest rate which have already been ordered for repayment in a separate judgment;
3. To the extent that it includes amounts not paid to the Debtors;
4. To the extent it relies on claim forms that were not properly completed;
5. To the extent it relies on claim forms that include information that is inconsistent with or refuted by other information in the claim form;
6. To the extent it relies on claim forms that include information that is refuted by evidence in the individual claimant/student files or enrollment patterns;
7. To the extent it includes educational expenses and fees related to other disciplines and degree levels.

Those issues will be adjudicated by the Bankruptcy Court.

Based the Debtors' analysis of the available information, the Debtors estimate that criminal justice restitution claims will be allowed in the amount of $8,825,611, plus an additional approximately $500,000 for the fifteen testifying students.

As a result, the Debtors estimate that the State's claim comprised each of the components discussed above will be allowed in the amount of $15,647,331 (not including $332,582 which will be paid by funds already deposited into court) whereas the State estimates that its claim totals $51,714,921.

### 2.    *U.S. Department of Education*

The U.S. Department of Education filed an unsecured claim against MSB in the amount of $718,832 and an unsecured claim against Globe for $1,134,057 relating to the discharge of federal funding provided to students who did not complete their programs because of the closure of the Debtors' schools.

The U.S. Department of Education asserts that it has granted $709,332 in closed-school discharges of debt incurred by MSB students and $1,110,293 incurred by Globe students. *See* Claim No. 60 (MSB) and Claim No. 8 (Globe). The Department asserts a right to charge back these obligations to the Debtors. These claims are unliquidated and disputed. These amounts far exceed the amounts identified by the U.S. Department of Education in two recently issued Final Program Review Determinations sent to the Debtors and do not take into account the offsetting claims of the Debtors to nearly $500,000 of the Debtors' funds currently being held by the Department.

Furthermore, the Debtors have administratively challenged the legality of the Department's determination of a "lookback period" and the legality of the Department's

assertion that the Debtors have liability for closed-school discharges. In the event either of those legal challenges is successful, the Department's claims will be either entirely eliminated or greatly reduced. The Debtors also have factual defenses to the Department's claims. For purposes of this Disclosure Statement, the Debtors estimate that the Department may have an unsecured claim of up to $1,000,000.

### 3.    Trade Claims

Tuition Options LLC, which provided services relating to the Debtors' loan portfolio is scheduled with a claim of $117,474.71, which is disputed. It has filed a proof of claim in that amount against both debtors. In addition, Pitney Bowes, CenterPoint Energy, American Express and Allstream have filed claims against the Debtors in the approximate aggregate amount of $25,000. The Debtors estimate that trade claims will be allowed in the amount of $110,000.

### 4.    Former Student Proofs of Claim

Approximately 80 former students have filed proofs of claim against the Debtors. The majority of these claims are seeking restitution relating to the Debtors' criminal justice program, recovery of loan payments, or similar claims, all of which, to the extent allowable, are duplicative of the claims discussed in Section 1, above. Additionally, some students submitted claims outside of the parameters of the state court case and objections would be raised, among other grounds, (i) to the extent it includes educational expenses and fees related to other disciplines and degree levels outside of criminal justice; (ii) to the extent it includes claims related to institutional loans originated at an 8% or less interest rate; and (iii) to the extent it includes claims that fall outside of the statute of limitations.

### 5.    Summary of General Unsecured Claims

Based on these estimates, the Debtors estimate that total aggregate claims of the State of Minnesota, U.S. Department of Education, trade claimants, and former students will likely total approximately $16,757,331. The Debtors believe the maximum liability is $52,798,984.

### 6.    Co-Borrower Liabilities

Both MSB and Globe are co-borrowers on a $2.1 million loan from Lake Area Bank, which is secured by real estate owned by MSB's subsidiary MSB Holdings – Lakeville, LLC, which is also a borrower. MSB is also a co-borrower on a $3.1 million loan from Home Federal Savings Bank, which is secured by real estate owned by a different subsidiary MSB Holdings – Rochester, LLC, which is also a co-borrower. Home Federal Savings Bank also has an interest in a reserve account owned by MSB with a balance of $458,874.

### 7.    Insider Claims

Several "insiders," as that term is used in the Bankruptcy Code, hold claims against the Debtors in the aggregate amount of $5,392,309.05 primarily for amounts that were advanced to or paid on behalf of the Debtors pre-petition. These claims are separately classified under the Plan, as described below. Myhre Holdings, Inc. has an unsecured claim against MSB in the

amount of $5,024.68 and an unsecured claim against Globe in the amount of $84,918.08. Terry Myhre has an unsecured claim against MSB in the amount of $2,619,345.55 and an unsecured claim against Globe in the amount of $1,739,220.74. Myhre Holdings-Middleton LLC has an unsecured claim against Globe in the amount of $943,800.00.

8.      *Intercompany Claims*

As of the Filing Date, Globe owed MSB $8,119,212 on an intercompany account. The Plan provides that this intercompany obligation will be cancelled, as described below.

**E.      Summary of Debtors' Assets**

As of the Filing Date, the Debtors had cash on hand of approximately $3.2 million. The Debtors project that the cash on hand will be approximately the same as of the Confirmation Date. In addition, MSB owns six subsidiaries that own and operate commercial real property. Prior to the shutdown of the school operations, the commercial properties mainly housed the school operations, but are now leased for the most part to unrelated third-party tenants and in some cases to non-debtor affiliates. The Debtors estimate that the subsidiaries have a net equity value (on a liquidation basis and net of secured debt to commercial banks) of $29,680,000, as detailed below.

| MSB Real Estate Holdings | | | | | |
|---|---|---|---|---|---|
| **Entity** | **Appraised Value** | **Commission** | **Mortgage** | **Closing Fees** | **Proceeds** |
| | | | | | |
| MSB Holdings - Blaine, LLC | $3,610,000 | ($180,500) | n/a | ($36,100) | $3,393,400 |
| MSB Holdings - Brooklyn Center, LLC | $5,900,000 | ($295,000) | ($2,355,000) | ($59,000) | $3,191,000 |
| MSB Holdings - Lakeville, LLC | $5,020,000 | ($251,000) | ($2,172,000) | ($50,200) | $2,546,800 |
| MSB Holdings - Rochester, LLC | $4,100,000 | ($205,000) | ($3,158,000) | ($41,000) | $696,000 |
| MSB Holdings - Shakopee, LLC | $6,700,000 | ($335,000) | n/a | ($67,000) | $6,298,000 |
| MSB Holdings - Woodbury, LLC | $14,420,000 | ($721,000) | n/a | ($144,200) | $13,554,800 |
| Total MSB Holdings Value | $39,750,000 | ($1,987,500) | ($7,685,000) | ($397,500) | $29,680,000 |

### F.      Potential Causes of Action

The Debtors may have causes of action under 11 U.S.C. § 544(a) and Minnesota law against its shareholders relating to non-cash distributions that were made by MSB in 2016 in the aggregate amount of $17,159,500 (the "2016 Distributions").   The Debtors have not yet completed an investigation of the 2016 Distributions, but the Debtors understand that the recipients of the 2016 Distributions may have defenses to any such causes of action, including that the Debtors were not insolvent at the time of the 2016 Distributions and that the 2016 Distributions were made without any actual intent to hinder, delay, or defraud any creditors.  In the event of the Reorganization Option, all general unsecured creditors will be paid in full and the Debtors do not expect to pursue any causes of action relating to the 2016 Distributions.  In the event of the Liquidation Option, all causes of action will be preserved and transferred to the Liquidating Agent, who will have the full power to investigate and pursue any causes of action pursuant to the Plan terms.

## III.      EVENTS DURING THE CHAPTER 11 CASE.

### A.      Bankruptcy Filing and First Day Orders.

The Debtors commenced their Chapter 11 Cases on the Filing Date by filing a voluntary petition under Chapter 11 of the Bankruptcy Code.  The Debtors have continued in possession of their assets and the management of their business as debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

On November 25, 2019, the Bankruptcy Court held an initial hearing to consider certain "first day" matters and entered orders that, among other things:

1.      Authorized joint administration of the Chapter 11 Cases;

2.      Authorized the maintenance of existing bank accounts and check stock and continued use of the Debtors' cash management system;

3.      Authorized the Debtors to pay accrued and outstanding prepetition employee compensation, benefits and related amounts; and

4.      Authorized the Debtors to redact portions of the creditor matrix, schedules, statements and related court filings.

### C.      Schedules and Statements.

On December 16, 2019, the Debtors filed their Schedules and Statement of Financial Affairs [Docket No. 44; Globe Docket No. 24].

### D.     Retention and Employment of the Debtors' Professionals.

During the Chapter 11 Case, the Bankruptcy Court approved the Debtors' retention and employment of the following professionals to assist in the administration of the Chapter 11 Cases: (1) Fredrikson & Byron, P.A. as bankruptcy counsel to the Debtors [Docket No. 38]; (2) Anthony Ostlund Baer & Louwagie, P.A., as special counsel [Docket No. 65]; (3) Donlin Recano & Company as noticing agent; (4) John Ladd & Associates as governmental and regulatory consultant [Docket No 64]; and (5) Cooper & Kirk as special counsel [Docket No. 93].

### E.     Appointment of Official Committee of Unsecured Creditors.

No official committee of unsecured creditors has been appointed in these Chapter 11 Cases.

### F.     Motions to Convert or Dismiss, or to Appoint a Trustee or Examiner.

On January 3, 2020, the State of Minnesota filed a Motion for Order Converting Cases Under Chapter 7 of the Bankruptcy Court or, Alternatively, for Dismissal or Appointment of Chapter 11 Trustee or Examiner [Docket No. 57]. On January 27, 2020, the U.S. Trustee filed an expedited Motion to Dismiss or Convert Case to Chapter 7 [Docket No. 78]. The Bankruptcy Court held an initial hearing on February 6, 2020 and an evidentiary hearing on February 20, 2020. On March 6, 2020, the Bankruptcy Court issued an oral ruling [Docket No. 126], issued findings of fact and conclusions of law [Docket No. 128] and entered an order appointing a Chapter 11 trustee unless a plan has been filed by March 18, 2020 and a plan has been confirmed by June 10, 2020 [Docket No. 130].

### G.     U.S. Department of Education Administrative Process

On December 23, 2019, the Debtors received an adverse ruling from the U.S. Department of Education to an appeal of Closed School Loan Discharges included in the Department's Final Program Review Determination (FPRD) (OPE ID 00464600, PRCN 2019-1-05-29957). The Debtors' appeal was based on purely legal defenses raised to the Department. As a result, this matter is ripe for further appeal. Moreover, a second FPRD is on appeal from Globe University to the Secretary of Education, which has been fully briefed (Re: In the Matter of Globe University, Docket No. 19-68-SP, PRCN: 2019-1-05-29923) and should be decided by USDE Administrative Law Judge Robert Layton in the next 3-6 weeks. The Debtors have a right to appeal the MSB FPRD (and if an adverse ruling, the Globe FPRD proceeding) to the Federal District Court or to have the dispute adjudicated in the Bankruptcy Court.

### H.     Continuation of State Court Litigation

The State of Minnesota's request for fees, costs, and civil penalties remain pending in the Hennepin County District Court.

### I.        <u>Claim Objections.</u>

As of the date of this Disclosure Statement, the Debtors have not initiated any claim objections.  The Debtors have preliminarily determined that they will object to, among others, the proofs of claim filed by the State of Minnesota and the U.S. Department of Education. By not identifying a potential claim objection in this Disclosure Statement, the Debtors do not waive their right to bring such an objection, and reserve all rights with respect thereto.

### J.        <u>Claim Estimation Process.</u>

As of the date of this Disclosure Statement, the Debtors have not initiated any process to estimate contingent or unliquidated claims, the fixing of which may unduly delay the administration of these Chapter 11 Cases.  The Debtors reserve the right to do so, and anticipate that such a process may be necessary to permit the confirmation of the Plan by June 10, 2020.

## IV.    SUMMARY OF THE PLAN.

*The below summary is provided for the convenience of holders of Claims and Equity Interests. If any inconsistency exists between the Plan and this Disclosure Statement, the terms of the Plan are controlling. The summary of the Plan in this Disclosure Statement does not purport to be complete and is subject to, and is qualified in its entirety by references to, the full text of the Plan, including the definitions of terms contained in the Plan. All holders of Claims and Equity Interests are encouraged to review the full text of the Plan and to read carefully this entire Disclosure Statement, including all exhibits.*

### A.        **Overview of Classification and Treatment of Claims and Equity Interests.**

Following the requirements of the Bankruptcy Code, all Claims are placed in categories. Most are placed into separate classes, others are unclassified.  These categories are described in detail in the Plan and later in this Section of the Disclosure Statement.

The Plan proposes different "treatment" of Claims, depending on their classification under the Plan:

| Class | Designation | Proposed Treatment: Reorganization Option | Proposed Treatment: Liquidation Option |
|---|---|---|---|
| Unclassified | Administrative Expense Claims | Pay Allowed Claims in Full | Pay Allowed Claims in Cash in Full |
| Unclassified | Priority Claims | Pay Allowed Claims in Full | Pay Allowed Claims in Cash in Full |
| 1 | Convenience Class | Pay Allowed Claims in Full | Immediate Payment of Lesser of $500 and Allowed Claim |
| 2 | Lake Area Bank | Reaffirm Obligations Under Lake Area Loan Agreement | Payment from Proceeds of Collateral; Treated in Class 4 For Any Deficiency |
| 3 | Home Federal Savings Bank | Reaffirm Obligations Under Home Federal Loan Agreement | Payment from Proceeds of Collateral; Treated in Class 4 For Any Deficiency |
| 4 | General Unsecured Claims | Pay Allowed Claims in Full | Pro-Rata Share of Liquidation Fund After Payment of Administrative Expenses Claims and Priority Claims |
| 5 | Claims of Insiders | Paid According to Existing Terms (but subordinated to Class 4 Claims) | Treated in Class 4 |
| 6 | Intercompany Claims | Cancelled | Cancelled |
| 7 | Equity Interests in MSB | Retain Equity Interests | Pro-Rata Share of Liquidation Fund After Payments of All Allowed Claims |
| 8 | Equity Interests in Globe | Equity Interests Cancelled | Equity Interests Cancelled |

The holders of claims or interests that are classified and are "impaired" are entitled to vote on the Plan. The classes that are entitled to vote under the Plan are: Class 1, 2, 3, 4, 5, and 7 because they are impaired under the Liquidation Option. However, in the event that the Reorganization Option is selected, Classes 1, 2, 3, 4, 5, and 7 will be unimpaired and therefore deemed to have accepted the Plan.

**B.     Description of Classes and Treatment.**

The following is a description of Claims, Equity Interests, classes, and treatment. The treatment is taken from the Plan, but additional information and descriptions regarding the claims and various estimates are provided in this Disclosure Statement. In case of inconsistency, the Plan controls.

1.    Allowed Administrative Expense Claims

Except as otherwise provided in Article III of the Plan, all Allowed claims specified in Bankruptcy Code § 507(a)(2), not previously paid, will be paid in full by the Reorganized Debtor or the Liquidating Agent, as applicable, as soon as practicable following the later of: (i) the Effective Date, or (ii) approval by the Court.

(1)    Professional Fees and Expenses

The Debtors have paid and intend to pay Allowed professional fees and expenses during the Chapter 11 Cases as allowed by Court orders.  Professional fees and expenses incurred through the time of Plan confirmation and not previously Allowed will be subject to Court approval after the Effective Date on a timeline to be determined by the Court.  Any such Allowed claims will be paid first from retainers, and then by the Reorganized Debtor or the Liquidating Agent, as applicable, as such Allowed claims are approved by the Court.

(2)    Claims Arising Under Assumed Executory Contracts or Unexpired Leases

The holders of Allowed claims arising under any executory contracts or unexpired leases that are assumed under Section 9.1 of the Plan will be paid the Cure Amount Claim, as set forth on Exhibit 9.1 to the Plan or as otherwise agreed between the holder of the claim and the Reorganized Debtor as soon as practicable after the Effective Date, unless otherwise ordered by the Court.

2.    Statutory Fees and Court Costs

Court costs and fees payable by the Debtors under 28 U.S.C. § 1930 will be paid by the Reorganized Debtor or the Liquidating Agent, as applicable, on the Effective Date or as soon as practicable thereafter or as required under the Office of the United States Trustee's quarterly payment guidelines.  The Debtors estimate these claims will be nominal, as they have remained current on such payments.  After confirmation, the Reorganized Debtor or the Liquidating Agent, as applicable, will continue to pay quarterly fees to the Office of the United States Trustee and file quarterly reports with the Office of the United States Trustee until these cases are closed by the Court, dismissed, or converted.  This requirement is subject to any amendments to 28 U.S.C. § 1930(a)(6) that Congress makes retroactively applicable to confirmed Chapter 11 cases.

3.    Unsecured Priority Claims

Allowed Priority Tax Claims will be paid by the Reorganized Debtor or the Liquidating Agent, as applicable, as soon as practicable following the later of: (i) the Effective Date, or (ii) the date on which such Priority Tax Claim becomes an Allowed Priority Tax Claim. Notwithstanding the provisions of Section 3.3.1.a of the Plan, the holder of an Allowed Priority Tax Claim shall not be entitled to receive any payment on account of any penalty arising with respect to or in connection with the Allowed Priority Tax Claim.  Any such claim or demand for any such penalty shall be subject to treatment in Class 4 (General Unsecured Claims), if not subordinated to Class 4 claims pursuant to an order of the Court.  The holder of an Allowed

13

Priority Tax Claim shall not assess or attempt to collect such penalty from the Reorganized Debtor or the Liquidating Fund, as applicable (other than as a holder of a Class 4 Claim).

      4.       Other Priority Claims

All other Allowed claims not specifically treated in Section 3.3 and entitled to priority under § 507(a) of the Bankruptcy Code will be paid by the Reorganized Debtor or the Liquidating Agent, as applicable, in full in cash as soon as practicable following the later of: (i) the Effective Date, or (ii) the date on which such claims are Allowed.

      5.       Class 1 – Convenience Class

      (1)      Classification. Class 1 consists of Allowed Convenience Class Claims.

      (2)      Treatment under Reorganization Option. Except to the extent that that a holder of an Allowed Convenience Class Claim agrees to a less favorable treatment, each holder of an Allowed Convenience Class Claim shall receive on account of, and in full and complete settlement, release and discharge of such Claim, payment in full in cash on (i) the Effective Date or as soon thereafter as practicable; (ii) if after the Effective Date, the date on which such Convenience Class Claim becomes Allowed or as soon thereafter as practicable; or (iii) such other date as may be ordered by the Bankruptcy Court. Allowed Convenience Class Claims shall accrue interest at the federal judgment rate from the Filing Date until paid.

      (3)      Treatment under Liquidation Option. Except to the extent that that a holder of an Allowed Convenience Class Claim agrees to a less favorable treatment, each holder of an Allowed Convenience Class Claim shall receive on account of, and in full and complete settlement, release and discharge of such Claim, a one-time cash payment of the lesser of (a) $500 or (b) the value of the Allowed Convenience Class Claim. Any Convenience Class Claims that are Allowed as of the Effective Date shall be paid by the Liquidating Agent within 90 days after the Effective Date. Any Convenience Class Claims Allowed after the Effective Date shall be paid by the Liquidating Agent as soon as practicable as the Liquidating Agent may determine in its sole discretion.

      (4)      Voting. Class 1 is Impaired under the Liquidation Option and is Unimpaired under the Reorganization Option. Therefore, holders of Convenience Class Claims are entitled to vote to accept or reject the Plan, but will be deemed to have accepted the Plan if the Reorganization Option is implemented.

      6.       Class 2 – Lake Area Bank

(1)     Classification. Class 2 consists of all Allowed claims arising against the Debtors from that certain Business Loan Agreement dated December 12, 2016, as amended and/or renewed, between (i) Lake Area Bank, as lender, and (ii) MSB and MSB Holdings – Lakeville, LLC, as co-borrowers (the "Lake Area Bank Loan").

(2)     Treatment under Reorganization Option. As of the Effective Date, the Reorganized Debtor shall assume the obligations of MSB under the Lake Area Bank Loan. Any non-monetary event of default resulting from the financial condition of MSB or the filing of the Chapter 11 Cases shall be deemed to be cured by the assumption of MSB's obligations by the Reorganized Debtor.  The Reorganized Debtor shall execute an amendment to the Lake Area Bank Loan, or such other documents as reasonably requested by Lake Area Bank, to memorialize its assumption of MSB's obligations under the Lake Area Bank Loan.

(3)     Treatment under Liquidation Option. Lake Area Bank shall continue to receive monthly payments of principal and interest on its Allowed claim until such time as the collateral securing its claim is sold. The holder of the claim will be paid the balance of its allowed claim from the proceeds of its collateral upon the closing of the sale of its collateral by the Liquidating Agent.  Any deficiency claim, to the extent Allowed, shall be treated in Class 4.

(4)     Voting. Class 2 is Impaired under the Liquidation Option and is Unimpaired under the Reorganization Option.  Therefore, Lakes Area Bank is entitled to vote to accept or reject the Plan, but will be deemed to have accepted the Plan if the Reorganization Option is implemented.

7.     Class 3 – Home Federal Savings Bank

(1)     Classification. Class 3 consists of all Allowed claims against the Debtors arising from that certain Business Loan Agreement dated December 30, 2013, as amended December 30, 2018, between (i) Home Federal Savings Bank, as lender, and (ii) MSB, Globe, and MSB Holdings – Rochester, LLC, as co-borrowers, and that certain Reserve Account Agreement dated December 23, 2016 (together, the "Home Federal Loan").

(2)     Treatment under Reorganization Option. As of the Effective Date, the Reorganized Debtor shall assume the obligations of MSB and Globe under the Home Federal Loan. Any non-monetary event of default resulting from the financial condition of MSB or the filing of the Chapter 11 Cases shall be deemed to be cured by the assumption of MSB's obligations by the Reorganized Debtor.  The Reorganized Debtor shall execute an amendment to the Home Federal Loan, or such other

15

documents as reasonably requested by Home Federal Savings Bank, to memorialize its assumption of MSB's and Globe's obligations under the Home Federal Loan.  Home Federal Savings Bank shall retain its interest in the Reserve Account.

(3)     Treatment under Liquidation Option. As of the Effective Date, Home Federal Savings Bank shall be entitled to enforce its rights under the Reserve Account Agreement pursuant to applicable law. Home Federal Savings Bank shall continue to receive monthly payments of principal and interest on its claim until such time as the collateral securing its claim is sold.  The holder of the allowed claim will be paid from the proceeds of its real estate collateral upon the closing of the sale of its collateral by the Liquidating Agent.  Any deficiency claim, to the extent Allowed, shall be treated in Class 4.

(4)     Voting. Class 3 is Impaired under the Liquidation Option and is Unimpaired under the Reorganization Option.  Therefore, Home Federal Savings Bank is entitled to vote to accept or reject the Plan, but will be deemed to have accepted the Plan if the Reorganization Option is implemented.

8.     Class 4 – General Unsecured Claims

(1)     Classification. Class 4 consists of General Unsecured Claims. General Unsecured Claims will include claims by counterparties to executory contracts and unexpired leases that are rejected pursuant to Section 9.1 of the Plan.  In the event of the Liquidation Option, Class 4 will also include Class 2 Claims, Class 3 Claims, and Class 5 Claims.

(2)     Treatment under Reorganization Option. Except to the extent that that a holder of an Allowed General Unsecured Claim agrees to a less favorable treatment, each holder of an Allowed General Unsecured Claim shall receive on account of, and in full and complete settlement, release and discharge of such Claim, payment in full in cash on the later of (i) the Effective Date or as soon thereafter as practicable; (ii) the date on which such General Unsecured Claim becomes Allowed or as soon thereafter as practicable; or (iii) such other date as may be ordered by the Bankruptcy Court.   Allowed General Unsecured Claims shall accrue interest at the federal judgment rate from the Filing Date until paid.

(3)     Treatment under Liquidation Option. Except to the extent that that a holder of an Allowed General Unsecured Claim agrees to a less favorable treatment, each holder of an Allowed General Unsecured Claim shall receive on account of, and in full and complete settlement, release and discharge of such Claim, on one or more distribution dates established under Section 8.1, a pro rata share of the net proceeds of the Liquidating Fund after the payment of all Allowed Administrative Expense Claims,

16

Allowed Unclassified Priority Claims, and all costs and expenses of the Liquidating Fund, in an aggregate amount not to exceed the amount of the Allowed General Unsecured Claim, plus interest at the federal judgment rate from the Filing Date until paid.

       (4)     Voting. Class 4 is Impaired under the Liquidation Option and is Unimpaired under the Reorganization Option. Therefore, holders of Class 4 Claims are entitled to vote to accept or reject the Plan, but will be deemed to have accepted the Plan if the Reorganization Option is implemented.

9.     Class 5 – Insider Claims

       (1)     Classification. Class 5 consists of all Allowed Insider Claims, other than claims classified in Class 6.

       (2)     Treatment under Reorganization Option. Except to the extent that that a holder of an Allowed Insider Claim agrees to a less favorable treatment, each holder of an Allowed Insider Claim shall receive on account of, and in full and complete settlement, release and discharge of such Claim, the full amount of the Allowed Insider Claim, paid over time, according to the existing terms of the Allowed Insider Claim. Payment of Allowed Insider Claims shall be subordinated to payment of Allowed General Unsecured Claims.

       (3)     Treatment under Liquidation Option. To the extent Allowed, Class 5 claims shall be treated in Class 4.

       (4)     Voting. Class 5 is Unimpaired under the Reorganization Option and is Impaired under the Liquidation Option. Therefore, holders of Class 5 Claims are entitled to vote to accept or reject the Plan, but will be deemed to have accepted the Plan if the Reorganization Option is implemented. Furthermore, such votes will not be counted with respect to determining whether the Plan has been accepted by an impaired class under 11 U.S.C. § 1129(a)(10).

10.    Class 6 – Intercompany Claims

       (1)     Classification. Class 6 consists of all Allowed claims held by MSB against Globe and all Allowed claims held by Globe against MSB.

       (2)     Treatment under Reorganization Option. As of the Effective Date, all intercompany claims between the Debtors shall be cancelled.

       (3)     Treatment under Liquidation Option. As of the Effective Date, all intercompany claims between the Debtors shall be cancelled.

(4)     Voting. Class 6 will receive no distribution under the Plan and therefore, holders of claims in Class 6 are deemed to have rejected the Plan and are not entitled to vote on the Plan.

11.     Class 7 – Equity Interests in MSB

(1)     Classification. Class 7 consists of all Equity Interests in MSB.

(2)     Treatment under Reorganization Option. As of the Effective Date, Class 7 Equity Interests shall retain their interests in the Reorganized Debtor and shall be entitled to full governance and economic rights in the Reorganized Debtor on and after the Effective Date.

(3)     Treatment under Liquidation Option. As of the Effective Date, holders of Class 7 Equity Interests shall be entitled to their proportionate share of the net proceeds of the Liquidating Fund after the payment of all Allowed Administrative Expense Claims, Allowed Unclassified Priority Claims, Allowed General Unsecured Claims, and all costs and expenses of the Liquidating Fund.  Upon dissolution of MSB by the Liquidating Agent, all Class 7 Equity Interests shall be cancelled pursuant to State law, and the obligations of MSB thereunder or in any way related thereto shall be discharged.

(4)     Voting. Holders of Class 7 Equity Interests are Unimpaired under the Reorganization Option and are Impaired under the Liquidation Option.  Therefore, holders of Class 7 Equity Interests are entitled to vote to accept or reject the Plan, but will be deemed to have accepted the Plan if the Reorganization Option is implemented.

12.     Class 8 – Equity Interests in Globe

(1)     Classification. Class 8 consists of all Equity Interests in Globe.

(2)     Treatment under Reorganization Option. As of the Effective Date, all Equity Interests in Globe shall be deemed cancelled, shall be of no further force, whether surrendered for cancellation or otherwise, and the obligations of Globe thereunder or in any way related thereto shall be discharged.  As soon as practicable after the Effective Date, Globe shall be dissolved under State law.

(3)     Treatment under Liquidation Option. As the Effective Date, all Equity Interests in Globe shall be deemed cancelled, shall be of no further force, whether surrendered for cancellation or otherwise, and the obligations of Globe thereunder or in any way related thereto shall be discharged. As soon as practicable after the Effective Date, Globe shall be dissolved under State law.

(4)    Voting. Holders of Class 8 Equity Interests are Impaired under both the Reorganization Option and the Liquidation Option, will receive no distribution on account of their Class 8 Equity Interests under both the Reorganization Option and the Liquidation Option, and will be deemed to have rejected the Plan.  As a result, holders of Class 8 Equity Interests are not entitled to vote on the Plan.

## C.    Reorganization Option.

In the event the Allowed General Unsecured Claims equal or are less than $20,000,000 as of the Confirmation Date, the Reorganization Option of the Plan will occur.

### 1.    Substantive Consolidation

Under the Reorganization Option, the Debtors' estates will be substantively consolidated for purposes of confirming and consummating the Plan, including, without limitation, voting, confirmation and distributions under the Plan.  This means that (i) all liabilities of the Debtors shall be treated as though they were pooled, (ii) each Claim filed or to be filed against either Debtor, as to which both Debtors are co-liable as a legal or contractual matter, shall be deemed filed as a single Claim against, and a single obligation of, the Debtors, (iii) all Claims held by a Debtor against the other Debtor shall be cancelled or extinguished, (iv) no Distributions shall be made under the Plan on account of any Claim held by a Debtor against the other Debtor, (v) all guarantees of any Debtor of the obligations of the other Debtor shall be eliminated so that any Claim against any Debtor and any Claim based upon a guarantee thereof executed by the other Debtor shall be treated as one Claim against the substantively-consolidated Debtors, and (vi) any joint or several liability of any of the Debtors shall be one obligation of the substantively-consolidated Debtors and any Claims based upon such joint or several liability shall be treated as one Claim against the substantively consolidated Debtors.

However, despite the substantive consolidation of the Debtors, confirmation of the Plan shall not (other than for purposes related to funding Distributions under the Plan) affect (i) the legal and organizational structure of the Debtors, (ii) executory contracts or unexpired leases that were entered into during the Chapter 11 Cases or that have been or will be assumed or rejected, (iii) the Debtors' ability to subordinate or otherwise challenge Claims on an entity-by-entity basis, (iv) any Causes of Action or defenses thereto, which in each case shall survive entry of the Confirmation Order as if there had been no substantive consolidation of the Estates of the Debtors, and (v) distributions to the Debtors from any insurance policies or the proceeds thereof. Notwithstanding the substantive consolidation called for herein, each Debtor shall remain responsible for the payment of U.S. Trustee fees pursuant to 28 U.S.C. § 1930 until its particular case is closed, dismissed or converted.

### 2.    Revesting and Ongoing Operations

Under the Reorganization Option, MSB will continue in existence.  References in the Plan to the "Reorganized Debtor" refer to MSB on and after the Effective Date.  Under the Reorganization Option, all of Globe's assets will be transferred to and vest in MSB, as reorganized, and Globe will be dissolved under State law.

19

### 3.    *Exit Financing*

Under the Reorganization Option, the Reorganized Debtor will obtain the funds necessary to make Plan payments from two sources.  First, the Reorganized Debtor will enter into loan agreements, and will cause several of its subsidiaries to grant mortgages to North Star Bank.  The proposed terms of the Exit Financing are attached as Exhibit 6.6.1 to the Plan.  Terry Myhre will provide significant financing accommodations to facilitate the Exit Financing by guarantying the Exit Financing or providing such other financial accommodations as reasonably requested by North Star Bank.  Second, the Reorganized Debtor will enter into subordinated financing from Terry Myhre in an amount necessary to make Plan payments.  The proposed terms of the Myhre Subordinated Financing are attached as Exhibit 6.6.2 to the Plan.

### 4.    *Preservation of Causes of Action and Avoidance Claims*

On the Effective Date, all Causes of Action, including Avoidance Claims, shall vest in the Reorganized Debtor, and the Reorganized Debtor may enforce or not enforce any Causes of Action that the Debtors or the estates may hold against any entity to the extent not expressly released under the Plan or by any Final Order of the Court, including, but not limited to, those items identified on Exhibit 6.8 to the Plan.  No person may rely on the absence of a specific reference in the Plan or the Disclosure Statement to any Cause of Action against them as any indication that the Reorganized Debtor will not pursue any and all available Causes of Action against them.  The Debtors expressly reserve all Causes of Action, including Avoidance Claims, for later enforcement.  Therefore, no preclusion doctrine shall apply to a Cause of Action upon, after, or as a consequence of, the Confirmation Order.  The Reorganized Debtor may, at its option, compromise any Cause of Action, Avoidance Claim, or any other claim, interest, or objection retained herein after the Effective Date without notice and a hearing and without Court approval.  All recoveries on the Causes of Action and Avoidance Claims shall be retained by the Reorganized Debtor.  Nothing in the Plan shall shorten or otherwise affect the Reorganized Debtor's deadline to assert Avoidance Claims or other Causes of Action as governed by section 546(a) of the Bankruptcy Code or other applicable law.

## D.    Liquidation Option.

In the event the Allowed General Unsecured Claims exceed $20,000,000 as of the Confirmation Date, the Liquidation Option of the Plan will occur.

### 1.    *Liquidating Fund*

In the event of the Liquidation Option, on the Effective Date, except as otherwise designated in the Plan, all of the Estate Assets shall become part of a liquidating fund ("Liquidating Fund"), which shall be used for the administrative costs of administrating the Plan and for payments to holders of Allowed claims and Equity Interests in accordance with the terms of the Plan under the direction of the Liquidating Agent.

2.      *Liquidating Agent*

A Liquidating Agent will be selected by the Debtors and appointed by the Court in the Confirmation Order.  The powers and duties of the Liquidating Agent are described in Section 7.2.3 of the Plan.  Generally, the Liquidating Agent will sell or otherwise liquidate or abandon all remaining Estate Assets to fund administration of the Liquidating Fund for the benefit of the Creditors and Equity Interest Holders.  The Liquidating Agent will also pursue any Causes of Action on behalf of the Debtors, object to claims, and then make distributions to Creditors and Equity Interest Holders pursuant to the Plan.

3.      *Preservation of Causes of Action and Avoidance Claims*

On the Effective Date, the Liquidating Agent shall be vested in and retain, as the representative of the estate under section 1123(b)(3)(B) of the Bankruptcy Code, all Causes of Action, including Avoidance Claims, and the Liquidating Agent may enforce or not enforce, consistent with its fiduciary duties, any Causes of Action that the Debtor, the estate, or the Liquidating Agent may hold against any entity to the extent not expressly released under the Plan or by any Final Order of the Court, including, but not limited to, those items identified in Exhibit 6.8 of the Plan.  No person may rely on the absence of a specific reference in the Plan or the Disclosure Statement to any Cause of Action against them as any indication that the Debtor or the Liquidating Agent will not pursue any and all available Causes of Action against them.  The Debtor expressly reserves all Causes of Action, including Avoidance Claims, for later enforcement by the Liquidating Agent.  Therefore, no preclusion doctrine shall apply to a Cause of Action upon, after, or as a consequence of, the Confirmation Order.  The Liquidating Agent may, at its option, compromise any Cause of Action, Avoidance Claim, or any other claim, interest, or objection retained herein after the Effective Date without notice and a hearing and without Court approval. To the extent required by the Bankruptcy Code, the Liquidating Agent is hereby designated as the "Plan Representative."  All recoveries on the Causes of Action and Avoidance Claims shall be retained by the Liquidating Agent for making distributions under the Plan.  Nothing in the Plan shall shorten or otherwise affect the Liquidating Agent's deadline to assert Avoidance Claims or other Causes of Action as governed by section 546(a) of the Bankruptcy Code or other applicable law.

**E.      Distributions and Claims Administration.**

Provisions relating to the mechanics of distributions are set forth in Article VIII of the Plan.

**F.      Executory Contracts and Unexpired Leases.**

As set forth in Article IX of the Plan, Exhibit 9.1 to the Plan identifies those Assumed Agreements that will be assumed as of the Effective Date, and the Cure Amount Claims that will be paid on the Effective Date.  All other executory contracts, unexpired leases, or other agreements that are not Assumed Agreements and were not previously assumed or rejected by Order of the Court in the Chapter 11 Case shall be deemed rejected as of the Effective Date. Entry of the Confirmation Order shall constitute, pursuant to sections 365 and 1123 of the Bankruptcy Code, the approval of the rejection of all such executory contracts and unexpired

leases. To the extent not subject to a claims bar date set forth in any prior or subsequent order of the Court, claims arising out of the rejection of an executory contract or unexpired lease pursuant to Section 9.1 of the Plan must be filed with the Court no later than 30 days after the entry of the Confirmation Order and, upon allowance, shall be an Allowed General Unsecured Claim. Any claims not filed within such applicable time periods shall be forever barred from receiving a distribution from the Reorganized Debtor, the Debtors, the estates, or the Liquidating Fund,

### G.    Conditions to Confirmation and the Effective Date.

Confirmation of the Plan will not occur unless the Confirmation Order is reasonably acceptable in form and substance to the Debtors, and the Plan has not been materially amended, altered or modified from the version filed on March 18, 2020, unless such material amendment, alteration or modification has been made in accordance with Section 13.1 of the Plan.

The Effective Date shall not occur, and the Plan shall not be consummated, unless and until each of the following conditions have been satisfied (unless waived by the Debtors):

a.    The Court shall have entered the Confirmation Order, the Confirmation Order shall be a Final Order, and no stay of the Confirmation Order shall then be in effect.

b.    The Debtor shall have sufficient cash on hand to pay obligations required to be paid on or as soon as reasonably practicable after the Effective Date of the Plan.

c.    The Plan shall not have been materially amended, altered or modified from the Plan as confirmed by the Confirmation Order, unless such material amendment, alteration or modification has been made in accordance with Section 13.1 of the Plan.

### H.    Effects of Confirmation.

The effects of confirmation of the Plan are governed by section 1141 of the Bankruptcy Code. Article X of the Plan also provides for specific effects of confirmation of the Plan.

1.    Title to and Vesting of Assets.

All property of the Debtors and the estates is dealt with by the Plan; therefore, on the Effective Date, to the full extent allowed by section 1141(b) of the Code, all property of the Debtors and the estates vests in the Reorganized Debtor or the Liquidating Fund, as applicable, and such property is free and clear of all liens, encumbrances, claims, and interests of creditors and equity security holders, except to the extent the Plan explicitly provides that such liens, encumbrances, claims, or interests are retained. From and after the Effective Date, the Reorganized Debtor or the Liquidating Fund, as applicable, may operate, use, acquire, and dispose of property in accordance with the Plan, free and clear of any restrictions of the Bankruptcy Code and the Bankruptcy Rules, and in all respects as if there were no pending case under any chapter or provision of the Bankruptcy Code, except as provided in the Plan.

2.      Corporate Action.

On the Effective Date, all matters provided for herein that would otherwise require approval of the stockholders or directors of the Debtors shall be deemed to have occurred and shall be in effect from and after the Effective Date pursuant to the applicable general corporation law of Minnesota, without any requirement of further action by the stockholders or directors of the Debtors.

3.      Injunction.

The Plan is binding on the Debtors, any Creditor, any holder of Equity Interests, or others to the full extent provided in section 1141(a) of the Code.  All entities who are bound by the Plan, including entities with claims not listed on the Schedules, or who are listed on the Schedules as disputed, unliquidated, or contingent and who did not timely file proofs of claim, are hereby enjoined and prevented from commencing or continuing any judicial or administrative proceeding or employing any process to interfere with the consummation or implementation of the Plan or the payments to be made hereunder, including commencing or continuing any judicial or administrative proceeding or employing any process against the Debtor, the estate, or the Liquidating Agent; provided, however, such injunction shall not prohibit any entity from pursuing actions they may have against third parties, except as otherwise set forth in the Plan.

4.      Discharge.

Confirmation of the Plan will provide the Debtors with a discharge only in the event of the Reorganization Option. As set forth in Section 10.5.4 of the Plan, in the event of the Reorganization Option, and except as otherwise provided in the Plan, confirmation of the Plan discharges, waives, and releases the Debtors from any debt that arose before the date the Plan is confirmed, regardless of whether reduced to judgment or not, liquidated or unliquidated, contingent or noncontingent, asserted or unasserted, fixed or not, matured or unmatured, disputed or undisputed, legal or equitable, known or future, that arose before the Confirmation Date, and any debt of a kind specified in Sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, regardless of whether or not proof of the claim based on such debt was filed or deemed filed under Section 501 of the Bankruptcy Code, such Claim is allowed under Section 502 of the Bankruptcy Code, or the holder of such claim has accepted the Plan.  The payments of, distributions on account of, or treatments of claims in the Plan are deemed to satisfy in full all claims.  In the Event of the Liquidation Option, pursuant to section 1141(d)(3) of the Bankruptcy Code, confirmation of the Plan does not discharge the Debtors' indebtedness.

5.      Permanent Injunction.

In the event of the Reorganization Option, and except as provided in the Plan, as of the Effective Date and subject to its occurrence, all persons that have held, currently hold, or may have asserted a claim, a Cause of Action or other debt, liability, interest, or other right of a holder of an equity interest that is discharged, released, or terminated pursuant to the Plan, are hereby permanently enjoined from commencing or continuing against the Debtors, in any manner or in any place, any: action or other proceeding; enforcing, collecting, or recovering in any manner any judgment, award, decree, or order; creating, perfecting, or enforcing any lien or

23

encumbrance; and/or asserting a set-off, right of subrogation, or recoupment of any kind against any debt, liability or obligation.

6.  Third Party Injunction

In exchange for the significant consideration provided by Terry Myhre in connection with the Plan, which is necessary for confirmation, the Plan contains the following Third Party Release, which is only applicable if the Reorganization Option occurs:

**Notwithstanding anything contained herein to the contrary, and only in event of the Reorganized Option, as of the Effective Date the Releasing Parties conclusively, absolutely, unconditionally, irrevocably, and forever discharge and release Terry Myhre, and covenant with and to Terry Myhre not to sue or otherwise seek recovery relating to, any and all claims, interests, obligations, debts, rights, suits, damages, causes of action (including without limitation under any State or federal securities laws and fraudulent transfer laws), remedies, and liabilities whatsoever, including any derivative claims asserted or which could be asserted on behalf of the Debtors or their estates or the Reorganized Debtor, whether known or unknown, arising pre- or post-filing, foreseen or unforeseen, existing or arising, in law, equity or otherwise, that such entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, their respective estates, the Reorganized Debtor, the Chapter 11 Cases, the subject matter of, or the transactions or events giving rise to, any claim or interest that is dealt with in the Plan, the business or contractual arrangements between the Debtors and the applicable Released Party, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date (the "Third Party Release"). Pursuant to Bankruptcy Rule 9019, entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Third Party Release, which includes by reference each of the related provisions and definitions contained herein, and finding that the Third Party Release is (1) in exchange for the good and valuation consideration provided by Terry Myhre in connection with the Plan; (2) a good faith settlement and compromise of the claims released by the Third Party Release; (3) in the best interests of the Debtors and their estates; (4) fair, equitable and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar to any of the Releasing Parties asserting any claim or cause of action released pursuant to the Third Party Release.**

7.  Exculpation and Limitation of Liability.

Under both the Reorganization Option and the Liquidation Option, certain parties who were involved with these Chapter 11 Cases will receive standard exculpation and limitation of liability related the Chapter 11 Cases and the Plan as set forth in Section 10.5.7 of the Plan.

## V.    POST CONFIRMATION MANAGEMENT OF THE REORGANIZED DEBTOR.

In the event of the Reorganization Option, the Reorganized Debtor will continue to exist after the Effective Date with all rights and powers of a corporation under the laws of the State of

Minnesota; Terry Myhre shall continue to be the President of the Reorganized Debtor and Kenneth McCarthy shall continue to be the Chief Financial Officer of the Reorganized Debtor.

## VI.   MEANS OF EXECUTION.

As further described in Articles V and VI of the Plan, in the event of the Reorganization Option, payments under the Plan will be funded by cash and other assets held by the Debtors' estates on the Effective Date and proceeds of loans from North Star Bank and Terry Myhre.  As further described in Articles V and VII of the Plan, in the event of the Liquidation Option, the assets of the Debtors' estates will be transferred to a Liquidation Fund, which will be administered for the benefit of the Creditors and Equity Interest Holders.

## VII.   TAX CONSEQUENCES OF THE PLAN.

**THE INCOME TAX LAWS APPLICABLE TO RECEIVING A DISTRIBUTION OR DEDUCTING A LOSS FROM A BANKRUPTCY ESTATE ARE COMPLEX. THE SUMMARY DESCRIPTION OF TAX CONSEQUENCES BELOW IS FOR GENERAL INFORMATIONAL PURPOSES ONLY AND IS SUBJECT TO SIGNIFICANT UNCERTAINTIES.**

**THE DEBTORS NEITHER HAVE REQUESTED A RULING FROM THE INTERNAL REVENUE SERVICE NOR HAVE OBTAINED AN OPINION OF COUNSEL WITH RESPECT TO THESE MATTERS. THUS, NO ASSURANCE CAN BE GIVEN AS TO THE TAX CONSEQUENCES OF THE PLAN.**

**THE DISCUSSION CONTAINED IN THIS DISCLOSURE STATEMENT AS TO FEDERAL TAX CONSIDERATIONS IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, FOR THE PURPOSE OF AVOIDING PENALTIES.**

**NO REPRESENTATIONS ARE MADE REGARDING THE PARTICULAR TAX CONSEQUENCES OF THE PLAN TO ANY HOLDER OF A CLAIM OR EQUITY INTEREST OR ANY OTHER ENTITY OR PERSON. EACH HOLDER OF A CLAIM SHOULD CONSULT HIS, HER, OR ITS TAX PROFESSIONAL TO UNDERSTAND FULLY THE FEDERAL, STATE, LOCAL, AND FOREIGN TAX CONSEQUENCES OF THE PLAN.**

The following discussion summarizes certain federal income tax consequences of the Plan to the Debtors and holders of general unsecured claims and interests. The summary is based upon relevant provisions of the Internal Revenue Code of 1986, as amended (the "Tax Code"), the applicable Treasury Regulations promulgated thereunder (the "Treasury Regulations"), judicial authority, published rulings, and such other authorities considered relevant now in effect, all of which are subject to change. This summary does not address the federal income tax consequences to holders of allowed administrative expense claims, priority claims, or secured claims, if any. This summary does not address foreign, state, or local income tax consequences, or any estate or gift tax consequences of the Plan, or the federal income tax consequences of the Plan to special classes of taxpayers. Accordingly, this summary should not be relied upon for

purposes of determining the specific tax consequences of the Plan with respect to a particular holder of a claim or interest.

### A.    Federal Income Tax Consequences to Holders of Unsecured Claims.

In accordance with the Plan, tax reporting Creditors will receive a distribution on the Claims and will realize a loss in an amount equal to the Claim, minus any distributions, on an adjusted tax basis.

The tax consequences to holders of Claims will differ and will depend on factors specific to the holder, including but not limited to: (i) whether the Claim, or a portion of the Claim, constitutes a claim for interest or principal, (ii) the origin of the Claim, (iii) the type of consideration received in exchange for the Claim, (iv) whether the holder is a United States person or a foreign person for tax purposes, (v) whether the holder reports income on the accrual or cash basis method, and (vi) whether the holder has taken a bad debt deduction or otherwise recognized a loss with respect to the Claim.

**THERE ARE MANY FACTORS THAT WILL DETERMINE THE TAX CONSEQUENCE TO EACH HOLDER OF A CLAIM. FURTHERMORE, THE TAX CONSEQUENCES OF THE PLAN ARE COMPLEX, AND IN SOME CASES, UNCERTAIN. THEREFORE, IT IS IMPORTANT THAT EACH HOLDER OF A CLAIM OBTAIN HIS, HER, OR ITS OWN PROFESSIONAL TAX ADVICE REGARDING THE TAX CONSEQUENCES TO THE HOLDER OF A CLAIM AS A RESULT OF THE PLAN.**

### B.    Federal Income Tax Consequences to the Debtors.

Tax Code Section 61(a)(11) provides generally that income from the discharge of indebtedness is includable as an item of gross income. It is anticipated that the Reorganization Option will not result in any discharge of indebtedness. The Liquidation Option may result in discharge of indebtedness. Tax Code Section 108(a)(1)(A) provides an exception to Tax Code Section 61(a)(11) by excluding from gross income any amount which, but for application of Tax Code Section 108(a)(1)(A), would be includable in gross income by reason of the discharge of indebtedness of a taxpayer if the discharge occurs in a Title 11 case. However, if amounts are excluded from gross income under Tax Code Section 108(a)(1)(A), various tax attributes of the taxpayer must be reduced. These tax attributes include its net operating loss carry-forwards, capital losses, loss carryovers and the basis in the property of the taxpayer. Since both Debtors are S corporations, the application of Tax Code Section 108 occurs at the corporation level and not the shareholder level even though an S corporation is a pass-through entity for federal income tax purposes. Any disallowed losses or deductions of the Debtor's shareholders will, however, be treated as net operating losses of the Debtors for purposes of attribute reduction. A transfer of property to the Liquidating Fund will be treated as a sale or exchange of that property for purposes of Tax Code Section 1001(a). In computing the gain or loss, the amount realized by the Debtors is the fair market value of the property on the date the transfer is made to the Liquidating Fund.

C.    **Tax Consequences to the Liquidating Fund.**

The Liquidating Fund may satisfy the requirements of a designated settlement fund under Section 468B of the Tax Code or a qualified settlement fund under Regulation 1.468B-1 of the Treasury Regulations. There are certain tax consequences associated with the characterization of the Liquidation Fund as a designated settlement fund or a qualified settlement fund.  It is contemplated the Liquidating Fund will treated as a qualified settlement fund under Regulation 1.468B-1 of the Treasury Regulations.  A qualified settlement fund can be established for contested liabilities.  A qualified settlement fund is subject to federal income tax on the modified gross income of the qualified settlement fund at the highest rates imposed upon trusts pursuant to Tax Code Section 1(e).  The modified gross income of a qualified settlement fund is its gross income, as defined in Tax Code Section 61 reduced by certain administrative and incidental expenses incurred in connection with the operation of the qualified settlement fund.  A qualified settlement fund is also allowed a deduction for losses sustained in connection with the sale, exchange, or worthlessness of property held by it as well as net operating losses to the extent such losses would be deductible in calculating the taxable income of a corporation.  Amounts transferred to a qualified settlement fund by a transferor to satisfy the claims for which the qualified settlement fund is established are not included in the qualified settlement fund's modified gross income.  A qualified settlement fund's initial basis in property it receives from a transferor is the fair market value of that property on the date of transfer to the fund.  Amounts that are distributed to or on behalf of claimants are not deductible by a qualified settlement fund.

**THE DEBTORS EXPRESS NO OPINION REGARDING WHETHER THE LIQUIDATING FUND IS A DESIGNATED SETTLEMENT FUND OR A QUALIFIED SETTLEMENT FUND. THE DEBTORS HAVE NOT REQUESTED A RULING FROM THE INTERNAL REVENUE SERVICE OR AN OPINION OF COUNSEL REGARDING WHETHER THE LIQUIDATING FUND IS A DESIGNATED SETTLEMENT FUND OR A QUALIFIED SETTLEMENT FUND. ACCORDINGLY, EACH CREDITOR IS URGED TO CONSULT ITS OWN TAX ADVISOR REGARDING THE CHARACTERIZATION OF THE LIQUIDATING FUND AND THE TAX CONSEQUENCES OF SUCH CHARACTERIZATION.**

VIII.    **ALTERNATIVES TO THE PLAN.**

The Debtors believe the Plan is in the best interests of its Creditors and Equity Interest Holders and should accordingly be accepted and confirmed. If the Plan as proposed, however, is not confirmed, the following three alternatives may be available: (A) an alternative plan of reorganization may be proposed and confirmed, (B) the Chapter 11 Cases may be dismissed, or (C) the Chapter 11 Cases may be converted to a liquidation under Chapter 7.

A.    **Alternative Plan Pursuant To Chapter 11 of the Bankruptcy Code.**

If the Plan is not confirmed, the Debtors may propose a different plan, which might involve an alternative means for reorganization of the Debtors. However, the Debtors believe that the terms of the Plan provide for the best result for the Creditors. The negotiation and drafting required for a different plan would likely add substantially greater administrative

expenses with no guarantee of a better result for the Creditors. For these reasons, the Debtors do not believe that an alternative plan of reorganization is a preferable alternative to the Plan.

### B.    Dismissal of the Chapter 11 Cases.

If the Plan is not confirmed, the Debtors or another party in interest may seek to dismiss the Chapter 11 Cases. After appropriate notice and a hearing, the Bankruptcy Court may grant the request and dismiss the Chapter 11 Cases. Dismissal of the Chapter 11 Cases would have the effect of restoring, or attempting to restore, all parties to the position they were in immediately prior to the Filing Date.

Upon the dismissal of the Chapter 11 Cases, the protection of the Bankruptcy Code would be lost. The Debtors believe that the State of Minnesota would pursue its State law remedies. The Debtors believe that these actions would favor the State of Minnesota over other Creditors and the destruction of value of the Debtors' property, which could potentially result in insufficient assets to satisfy other Creditors. Therefore, the Debtors believe that dismissal of the Chapter 11 Cases is not a preferable alternative to the Plan.

### C.    Conversion to Chapter 7 Liquidation.

If the Plan is not confirmed, the Debtors or another party in interest may seek to convert the Chapter 11 Cases to cases under Chapter 7. After appropriate notice and a hearing, the Bankruptcy Court may grant the request and convert the Chapter 11 Cases. Upon conversion, a chapter 7 trustee would hire his or her own professionals, subject to Court approval, and proceed to liquidate assets and object to Claims, as appropriate. Once all assets were liquidated and all claim objections were finalized, a process that would take many months and possibly years, the chapter 7 trustee would propose a distribution of the assets in accordance with the priority scheme set forth in the Bankruptcy Code. The Debtors believe that conversion to Chapter 7 would negatively impact the value of the Debtors' assets and result in delayed distributions to Creditors. Therefore, the Debtors believe that conversion of the Chapter 11 Cases to Chapter 7 is not a preferable alternative to the Plan.

## IX.    ACCEPTANCE AND CONFIRMATION OF THE PLAN.

### A.    General Confirmation Requirements.

Section 1129(a) of the Bankruptcy Code requires the Bankruptcy Court, after appropriate notice, to hold a hearing on confirmation of a plan (the "Confirmation Hearing"). In order for a plan to be confirmed at the Confirmation Hearing, the Bankruptcy Code requires that the Bankruptcy Court determine that the Plan complies with the technical requirements of Chapter 11 of the Bankruptcy Code and that the disclosures concerning the Plan have been adequate and have included information concerning all payments made or promised in connection with the Plan and this Chapter 11 Case.

Section 1129(a) of the Bankruptcy Code contains the requirements for confirmation of a plan. Among these requirements are that (1) a plan must be accepted by the requisite votes of creditors except to the extent that the plan may be confirmed over a dissenting class pursuant to 11 U.S.C. § 1129(b); (2) a plan must be feasible, meaning that there is a reasonable probability

that the debtor will be able to perform its obligations under the plan without further need of financial reorganization; (3) a plan must be in the "best interests" of all creditors, meaning that creditors will receive at least as much under the plan as they would receive in a hypothetical liquidation case under Chapter 7 of the Bankruptcy Code; and (4) a plan must comply with the applicable provisions of Chapter 11 of the Bankruptcy Code.

The Debtors believe that the Plan complies with all of these requirements, including the specific requirements further discussed below.

### B.    Best Interests Test.

The "best interests of creditors" test requires that the Bankruptcy Court find either (1) that all members of each impaired class has accepted the Plan or (2) that each holder of an Allowed Claim of each impaired class of Claims will receive or retain under the Plan, on account of the Claim, property of a value that is not less than the amount that the holder would receive or retain if the Debtors were hypothetically liquidated under Chapter 7 of the Bankruptcy Code, as of the Effective Date.

To calculate what holders of Claims would receive if the Debtors were hypothetically liquidated under Chapter 7 of the Bankruptcy Code, the Bankruptcy Court must first determine the dollar amount that would be realized from the hypothetical liquidation (the "Chapter 7 Liquidation Fund"). The Chapter 7 Liquidation Fund would consist of the net proceeds in the Debtors' hypothetical Chapter 7 case from the disposition of the Debtors' assets augmented by the cash held by the Debtors and recoveries on actions against third parties, if any.

The Chapter 7 Liquidation Fund would then be reduced by the costs of liquidation, including without limitation (1) the fees and expenses of a trustee, counsel for the trustee, and any other professionals for the trustee, (2) selling expenses, (3) unpaid expenses incurred by the Debtors in the Chapter 11 Case, such as fees for attorneys, financial advisors, and accountants, that would be allowed in a Chapter 7 proceeding, (4) interest expense on oversecured debt, if any, (5) and claims incurred by the Debtors during the pendency of the Chapter 11 Case. These costs of liquidation would be paid from the Chapter 7 Liquidation Fund before the balance of the Chapter 7 Liquidation Fund would be made available to the Creditors. In addition, the conversion to Chapter 7 would establish a new bar date for the filing of claims in the Chapter 7 case and additional filed claims or claims that would other arise upon conversion to a Chapter 7 case would dilute the balance of the Chapter 7 Liquidation Fund available to Creditors. The present value of the distributions out of the Chapter 7 Liquidation after deduction of the amounts described above is then compared to the present value of the property offered to each of the classes of Claims under the Plan to determine if the Plan is in the best interests of each holder of a Claim.

The Debtors believe that the Plan as proposed is in the best interest of all Creditors. Under the Reorganization Option, Allowed claims will be paid in full, and will be paid more quickly than they would be paid under a Chapter 7 case.  Under the Liquidation Option, the Debtors believe that there will be cost savings and more expeditious distributions as compared to a Chapter 7 case.  The Chapter 7 trustee would be entitled to compensation of a percentage of all funds distributed to parties in interest pursuant to 11 U.S.C. § 326, with the compensation

necessarily diluting the amount of funds available to pay Creditors. Furthermore, under the Liquidation Option, Creditors would receive interim distributions, as opposed to being forced to wait until the end of the process to receive a distribution. Attached as **Exhibit A** is an analysis of expected recoveries to creditors under a hypothetical Chapter 7 liquidation.

### C. Financial Feasibility Test.

In addition to the requirements discussed above, the Bankruptcy Code requires that consummation of a plan will not likely be followed by the liquidation of, or the need for further financial reorganization of, the debtor. In this case, the Debtors have prepared projections of the cash flow for the expected operations of the Reorganized Debtor. The cash flow projections are attached as **Exhibit B** to this Disclosure Statement. The cash flow projections demonstrate that the Debtors will have viable operations after funding the Plan and making all payments required pursuant to the Plan. Accordingly, the Debtors believe that the Plan passes the financial feasibility test.

### D. Cramdown Alternative.

In the event that a certain class or classes of Claims reject the Plan, the Debtors may seek confirmation of the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code. Specifically, Section 1129(b) of the Bankruptcy Code provides that a plan can be confirmed even if the plan is not accepted by all impaired classes, as long as at least one impaired class of claims has accepted it. A bankruptcy court may confirm a plan at the request of the plan proponent if the plan "does not discriminate unfairly" and "is fair and equitable" as to each impaired class that has not accepted the plan. A plan does not discriminate unfairly within the meaning of the Bankruptcy Code if a dissenting class is treated equally with respect to other classes of equal rank. The Debtors believe that the Plan does not discriminate unfairly with respect to any classes of Claims.

In addition, a plan is fair and equitable as to a class of claims which rejects a plan if the plan provides (i) for each holder of a claim included in the rejecting class to receive or retain on account of that claim property that has a value, as of the effective date of the plan, equal to the allowed amount of the claim; or (ii) that the holder of any claim or interest that is junior to the claims of the class will not receive or retain on account of the junior claim or interest any property at all.

The Debtors believe that the Plan meets the "fair and equitable" requirements of Section 1129(b) of the Bankruptcy Code with respect to holders of Claims in all classes. Specifically, with respect to the Reorganization Option, holders of Claims will be paid in full and are not Impaired. With respect to the Liquidation Option, the Plan provides that Equity Interests will not receive any economic benefit unless and until all Claims are paid in full, with interest. The Debtors understand, however, that the Plan may not be confirmable with respect to these classes if any class does not vote in favor of the Plan.

### X.   RISK FACTORS TO BE CONSIDERED.

HOLDERS OF CLAIMS AND EQUITY INTERESTS SHOULD READ AND CONSIDER CAREFULLY THE INFORMATION SET FORTH BELOW, AS WELL AS THE

OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT, PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN. THIS INFORMATION, HOWEVER, SHOULD NOT BE REGARDED AS THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND/OR ITS IMPLEMENTATION.

### A.    Failure to Satisfy Vote Requirement.

If the Debtors obtain the requisite votes to accept the Plan in accordance with the requirements of the Bankruptcy Code, the Debtors intend, as promptly as practicable thereafter, to seek confirmation of the Plan. In the event that sufficient votes are not received, the Debtors may be forced to pursue an alternative plan of reorganization, to dismiss the Chapter 11 Cases, or convert the Chapter 11 Cases.

### B.    Non-Confirmation or Delay of Confirmation of the Plan.

In the event a party objects to the Plan, it is possible that the Bankruptcy Court may not approve confirmation of the Plan.

### C.    Non-Consensual Confirmation.

In the event any impaired class of Claims does not accept the Plan, the Bankruptcy Court may nevertheless confirm the Plan at the Debtors' request if the cramdown requirements, described in Section 9(F) of this Disclosure Statement, are met. The Debtors believe that the Plan satisfies these requirements.

### D.    Risk of Non-Occurrence of the Effective Date.

Although the Debtors believe that the Effective Date will occur reasonably soon after the Confirmation Date, there can be no assurance as to the timing or as to whether the Effective Date will in fact occur.

### E.    Classification and Treatment of Claims.

Section 1122 of the Bankruptcy Code requires that the Plan classify Claims against the Debtors. The Bankruptcy Code also provides that the Plan may place a Claim in a particular class only if the Claim is substantially similar to the other Claims in the class. The Debtors believe all Claims have been appropriately classified in the Plan. To the extent that the Bankruptcy Court finds that a different classification is required for the Plan to be confirmed and the reclassification adversely affects the treatment of the Claim of any Creditor, the Debtors would be required to re-solicit votes for or against the Plan.

The Bankruptcy Code also requires that the Plan provide the same treatment for each Claim of a particular class unless the holder of a particular Claim agrees to a less favorable treatment of its Claim. The Debtors believe that it has complied with the requirement of equal treatment. To the extent that the Court finds that the Plan does satisfy the equal treatment requirement, the Court could deny confirmation of the Plan.

Issues or disputes relating to classification or treatment could result in a delay of the confirmation or consummation of the Plan and could increase the risk that the Plan will not be consummated.

## XI.    CONCLUSION.

The Plan offers the best alternative for the highest and fastest recovery for Creditors. Accordingly, the Debtors believe that the Plan is in the best interests of the Creditors and other interested parties, and the Debtors urge the holders of Claims and Equity Interests entitled to vote to accept the Plan and to evidence their acceptance by properly voting and timely returning their ballots.

[Signatures on following page.]

Minnesota School of Business, Inc.

/e/ Terry Myhre
By: Terry Myhre
Its: President/Chairman


Globe University, Inc.

/e/ Terry Myhre
By: Terry Myhre
Its: President/Chairman


FREDRIKSON & BYRON, P.A.

*/e/ Clinton E. Cutler*
Clinton E. Cutler (#0158094)
James C. Brand (#387362)
Samuel M. Andre (#0399669)
**FREDRIKSON & BYRON, P.A.**
200 South Sixth Street
Suite 4000
Minneapolis, MN  55402-1425
(612) 492-7000

**ATTORNEYS FOR THE DEBTORS**

## Exhibit A

## Liquidation Analysis

**Liquidation Analysis**
**Minnesota School of Business, Inc. and Globe University, Inc.**

| Assets | |
|---|---:|
| **Real Property (net of commissions and fees)** | |
| MSB Holdings - Blaine, LLC | $3,393,400 |
| MSB Holdings - Brooklyn Center, LLC | $5,546,000 |
| Less first mortgage | ($2,355,000) |
| MSB Holdings - Lakeville, LLC | $4,718,800 |
| Less first mortgage | ($2,172,000) |
| MSB Holdings - Rochester, LLC | $3,854,000 |
| Less first mortgage | ($3,158,000) |
| MSB Holdings - Shakopee, LLC | $6,700,000 |
| MSB Holdings - Woodbury, LLC | $13,554,800 |
| | |
| **Cash** | |
| Wells Fargo Bank Account | $3,200,000 |
| Home Federal Reserve Account | $458,874 |
| Court Deposit | $332,582 |
| **Bonds** | $1,200,000 |
| **Loan Portfolio (uncertain value)** | $0 |
| **Furniture, Fixtures and Equipment (liquidation value)** | |
| **Avoidance Actions (uncertain value)** | |
| | |
| Unsecured Creditor "Waterfall" | |
| **Distributable Assets** | $35,273,456 |
| | |
| **Administrative claims** | |
| Chapter 11 administrative expenses | $170,000 |
| Chapter 7 trustee fees* | $1,082,954 |
| | |
| **Priority Unsecured Claims** | |
| | |
| **Total Available for Distribution to Unsecured Claims** | **$34,020,502** |
| | |
| **Claims Treated in Class 4 Under Liquidation Option (maximum amount)\*\*** | **$58,191,293** |
| **Percentage Recovery (maximum amount)** | **58.5%** |
| | |
| **Claims Treated in Class 4 Under Liquidation Option (Debtors' estimate)\*\*** | **$22,149,640** |
| **Percentage Recovery (Debtors' estimate)** | **100.0%** |

*Maximum allowed under 11 U.S.C. § 326(a)

**Under Liquidation Option, Class 4 includes Classes 1 and 5; assumes no deficiencies owed to Classes 2 and 3

## **Exhibit B**

**Cash Flow Projections**

[To be filed at a later date]